IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GIAN SINGH SAMBHI, et al.

      Plaintiffs,

v.                                                                            CIV 09-1053 MCA/KBM

HARPREET SINGH, et al.

      Defendants.


# COURT'S FINDINGS OF FACT
# AND CONCLUSIONS OF LAW

THIS MATTER is before the Court on Plaintiff's Emergency Motion for Appointment of a Receiver *(Doc. 139)*; *see also (Doc. 246)* ( corrected copy to remove artifact). Following a series of evidentiary hearings held on May 30, July 11, July 12, and August 29, 2012 (transcripts of the evidentiary hearings cited as HT-I, HT-II and HT-III, respectively). The Court also heard oral argument on the motion on August 24 and September 12, 2012. The Court now sets forth its findings of fact and conclusions of law.

## FINDINGS OF FACT

**Formation of the Corporations**

1. The parties became close friends in about 2000 and over the years engaged in many informal transactions including numerous loans and some involving the purchase of real estate, many of these dealings done with little or no documentation.

2. At issue in this litigation are four hotels in which the proportion of ownership in the Subchapter S ("S") corporations holding title to each of the hotels is disputed:

| Corporation | Hotel Location | Now Operating Franchise ("Flag") |
|---|---|---|
| Bababudhaji ("B Corp.") | Grants | Comfort Inn |
| Gurunanakdevji ("G Corp.") | Grants | Travelodge |
| PJS Corp. | Grants | Super 8 |
| ADJ Corp. | Gallup | Baymont (formerly Comfort Inn) |

3. The corporations holding the Grants hotels (B, G and PJS) were formed in late 2005.

4. In forming the various corporations, the parties agreed that the amount of capital contributions would determine the proportionate share of ownership.

5. The amounts of capital contributions by the parties and the corporation to which each contribution would be allocated are in dispute.

**Background Regarding Accounting Testimony**

6. Plaintiff's' expert, Brian Reinhardt ("Reinhardt"), is a certified public accountant and has served in that capacity for over 27 years and has significant experience in S Corporations. [HT-II 43: 12–-17]

7. The Sage Accounting Firm performs all bookkeeping, accounting and tax services for all four of the corporations sued in this litigation.  James Small is the C.P.A.owner of Sage Accounting and only recently became involved in the issues underlying this litigation.  Gwen Berg holds the title of "staff accountant" but actually performs the bookkeeping  for all of the corporations and has done so from their inception.

8. Sage's accounting records for these corporations from 2005 were destroyed in the regular course of Sage accounting's business. [HT-III 89:8 – 90:5]

9. In preparing his expert report, Mr. Reinhardt reviewed the distributions to shareholders as they were recorded in the financial records provided by Sage Accounting from 2006 through 2010 for the three corporations located in Grants, NM and also for ADJ Corporation which has been in existence from 2007 to the present. [HT-I 51:6–12]

**Capital Contributions Are In Dispute**

10. Reinhardt's report contains a table purporting to list the capital contributions made by Plaintiffs, but some of the identified contributions were not verified or appear incorrect. [HT-II 100:12 – 24]

11. Although Plaintiffs told Reinhardt that Gian Sambhi ("Gian") made contributions of $100,000 on September 13, 2005 and $50,000 on September 15, 2005 from his Bank of America account, those sums were transferred not to Defendants, but to an account ending in 3607 belonging to Gian's brother, Prem Sambhi ("Prem"). [HT-II 103:20 – 104:22, Defendants' Exhibit 12]]

12. Plaintiffs testified that they told Reinhardt that they had contributed $10,000 in cash, but there is no documentation or verification. [HT-III 183:25 – 184:6 and HT-II 108:24 – 25]

13. Defendants Harpreet and Parmjit Singh ("Harpreet" and "Parmjit") claim that at the time of the hotel purchase, Gian owed them money from the series of loans, but for almost all of the loans, they have no documentation. [HT-III 184:17 – 20]

14. Harpreet and Parmjit claim that some of the money transferred into their account by Plaintiffs was for repayment of the series of loans between them rather than contributions towards a hotel purchase. [HT-III 184:17 – 185:24]

15. Before the parties decided to go into the hotel business, Plaintiff Gian and Defendant Harpreet jointly owned two houses in California.  [HT-III 182:2 – 11]

16. Gian borrowed $238,000 from a home equity line of credit that was secured by those jointly owned properties. [HT-III 182:3 – 25]

17. When the properties were sold, the $238,000 due on the credit line was paid off equally by Gian and Harpreet.  [HT-III 182:3 – 25]

18. At the time the Grants hotels were purchased, Gian owed Harpreet $119,000 that he had contributed towards paying off the line of credit and perhaps other money from the earlier series of loan transactions.

19. Initially, Defendants did not dispute that Gian owns at least 31% of B Corporation that owns the Grants Comfort Inn.

20. Because Gian now contends that his capital contribution was for the purchase of all three Grants hotels, Defendants now maintain that Gian's interest in B Corporation may be less than 31%.

21. Jetinder also claims an ownership interest in B Corporation.  If that is true, the other shareholders' interests, including Gian's interest, could be diluted.

22. There is a legitimate dispute regarding the amount of money that was contributed by the parties towards the hotel purchases and how those contributions were allocated among the various corporations.  [HT-II 109:5 – 7]

**Payments to Shareholders**

23. Payments made to shareholders have been classified as either distributions, management fees or shareholder account receivables, and those characterizations have variously changed over the years as described below.

24. Shortly after the Grants hotels were purchased, Gian transferred his stock to his bother, Prem. [HT-III 20:23-25 – 21:5]

25. Gian took back the stock in 2008 when Prem was diagnosed with cancer. [HT-III 21:6 –16]

26. During the time he held the shares that originally were owned by Gian, Prem received $135,000 in shareholder distributions from B Corp. [Defendants' Exhibit 2]

27. In late 2006, Sage Accounting reclassified $108,684 of those distributions made to Prem from B Corporation as shareholder receivables because B Corporation actually lost money that year and this amount represents payment made in excess of Prem's proportionate share of distributions made that year. [HT-III 81:14–25]

28. After Prem transferred the shares back to him, Gian received shareholder distributions from B Corp. totaling $52,960. [Defendants' Exhibit 2]

29. In their motion at Paragraphs 9(c) and 10, Plaintiffs contend that Defendants Harpreet and Parmjit benefitted from $25,000 in shareholder distributions in July 2006. In fact, that $25,000 distribution was wired to the account of Plaintiff Jetinder Singh ("Jetinder"). *Doc. 146-3*.

30. Prior to the filing of this lawsuit, distributions were made to shareholders although sometimes they were mischaracterized as management fees.

31. For instance, "management fees" which were actually shareholder distributions were made in 2009 as follows: $57,000 to Gian's wife, Simranjit Kaur; $57,000 to Parmjit, and $47,000 to Harpreet. These amounts are roughly proportional – 35%, 35% and 29% respectively, to Sage Accounting's attribution of ownership in B Corporation – 31%, 38% and 31% respectively. [HT-II 85 – 89]

32. Gian had requested the above distribution be made to his wife in order to pay for their daughter's educational needs. [HT-III 12:12–25]

33. Prior to the filing of the lawsuit, distributions (other than those to Prem during his ownership) were made to shareholders in roughly the percentage of ownership attributed to each shareholder by Sage Accounting. For instance, in February 2009, B Corporation paid distributions of $12,400 to both Gian and Harpreet and $15,200 to Parmjit – corresponding to ownership interests of 31%, 31% and 38% respectively on Sage Accounting's books. [HT-II 93 – 94]

34. Gian originally denied receiving the above $12,400 distribution. *Doc. 246* at ¶ 18-20.

35. A wire transfer payment order and Gian's bank account statement, however, verify Aman Shama's testimony that he wired the $12,400 from Grants State Bank account number ending in 1930 on February 10, 2009 at Gian's request. [Defendant's Exhibit 9]

36. Gian now claims that he was instructed by Parmjit "to put it back in his account" but this assertion is unsupported. [HT-III at 191:17-23]

37. Gian made two transactions the same day the money was wired into his account which total $12,400: (1) a transfer to an unknown account ending in 4748 for $5,700; and (2) a cash withdrawal of $6,700. None of the money was returned to B Corp.'s Grants State Bank account. [Plaintiffs' Exhibit 16]

38. Gian claims an ownership interest in all three corporations owning the Grants hotels (B, G and PJS), but he has never claimed nor held any ownership interest in ADJ Corporation which owns the Gallup hotel.

39. It is Defendants' position that Gian owns stock only in B Corporation.

40. In May 2009, before filing this lawsuit, Gian nevertheless withdrew $10,000 from each of the three other corporations (G, PJS and ADJ). Defendants contend that those funds were wrongfully taken by Gian. [HT-III 79:23 – 80:6]

41. ADJ Corporation has not made any shareholder distributions since it was created.

**Non-Payment of Distributions to Plaintiffs Since the Filing of This Lawsuit**

42. Defendants have received significant distributions from the three corporations owning the Grant hotels (B, G and PJS) even after this lawsuit was filed.

43. It is undisputed that from the date this lawsuit was filed in 2009, the corporations have paid shareholder distributions only to the defendants and have indicated that none will be paid to plaintiffs until the Court determines the relative ownerships in the corporations.

44. This decision to pay distributions to defendant shareholders only has necessarily resulted in disproportionate shareholder distributions.

45. If disproportionate distributions are made among shareholders, this may be seen as creating two classes of stock.

46. One qualification of an S Corporation is that the S Corporation can only have one class of stock. [HT-I 58:24 –25]

47. S Corporations are pass-through entities and therefore do not pay taxes on their own. [HT-II 32: 21–22]

48. Subchapter S status is beneficial to the shareholders as distributions are taxed only once.

49. If the corporations lose their Subchapter S status, it would result in disadvantageous tax results to the shareholders.

50. Also, if a Subchapter S corporation makes distributions in excess of the accumulated profits of the corporation, those distributions become taxable to the shareholders. [HT-I 55:2–6]

51. A "K-1" is the piece of the corporate tax return that goes to the individual shareholder showing his proportionate share of the income deductions, distributions that were received and part of the tax return. [HT-I 67:14-18]

52. No K-1 is given to a shareholder who is given a loan from the corporation.

53. Sage Accounting has always attributed Gian (or Prem during his holding of the shares) with a 31% ownership interest in B Corporation and no ownership in the other three corporations.

54. In the past, Defendants conceded that Gian owns 31% of B Corp., but they now maintain that Gian's share may be diluted if his capital contribution is found to have gone for the purchase of all three Grants hotels.

55. Prior to the filing of this lawsuit, Plaintiffs did not complain to Sage Accounting about its attribution of percentage ownership in the corporations from their inception. [HT-III 109:3–7]

**Recent Re-Classifications of Payments to Shareholders**

56. Defendants decided in late 2011 to re-classify certain of the shareholder distributions as "accounts receivable" because they "wanted to see how much monies [Plaintiffs] received extra." [HT-III 49–50]

57. Final K-1's had been previously issued to shareholders when the distributions were made.

58. It is unclear if Defendants intend to file amended K-1's which might alter the recipient's tax liability on those payments which have been reclassified.

59. Defendants instructed Sage Accounting to make those reclassifications, which it did under protest.

60. A possible reason for the re-classification might be in response to Plaintiff's arguments that distributions made only to Defendants since the filing of this lawsuit could be seen as creating two classes of stock and jeopardize the Subchapter S status of the corporations.

61. It is Reinhardt opinion that if the IRS were to look at the reclassification of the shareholder distributions to loans to shareholder's, in the absence of proper supporting documentation, the shareholder distributions would have been taxable to the shareolders. [HT-I 56:3 – 58:19]

62. For any of the payments made to shareholder which have been or are now classified as shareholder receivables, there are no written notes or agreements setting forth any terms for loans to any of the corporations.

63. Defendants dispute that reclassifications of payments from distributions to receivables is of no real consequence and "just changes made in the accountant's computer"

because no one outside of the shareholders, Sage Accounting and Reinhardt have ever seen the classification entries.

64. The decision to reclassify has created significant confusion and made an accurate accounting more difficult.

65. Plaintiffs rely on their Exhibit 18 "Receivable Reconciliation," but it does not give a complete picture of shareholder/party payments because it does not capture payments classified as distribution and management fees. For instance, the accounts receivable to Prem during the time he held Gian's shares is not reflected in the Plaintiff's column, nor is the $57,000 distribution to Gian's wife that was classified as a management fee.

66. Reinhardt is waiting for additional information from the Defendants to supplement his original report. [HT-I 43:25 – 44:2]

67. Because Small's summary (Defendants' Exhibit 22) of all payments to shareholders uses Defendants' "belief" of appropriate allocations of the parties' interests to create a chart of what shareholders are owed at this point, its accuracy is also questionable.

68. To complicate matters even more, Defendants are again contemplating reversing the reclassifications.

**Fairness Concerns**

69. Defendants decided not to pay any distributions to Plaintiffs until the resolution of this lawsuit because Plaintiffs' percentage of shares in the companies owning the three Grants hotels was in dispute.

70. Because Plaintiffs' proportion of ownership is at issue, so is that of Defendants, so this rationale for discontinuing distributions to some, but not all, of the shareholders is suspect.

71. The corporations' payment of Defendants' attorney fees and costs (now over $200,000) gives Defendants a distinct advantage in this litigation since Plaintiffs are paying their own fees and costs.

**Other Raised Concerns**

72. There is no evidence that personal expenses have been paid with corporate funds.

73. Plaintiffs' concern that insurance on the hotels was not kept up to date resulted from a misunderstanding – all hotels have maintained appropriate insurance coverage.

74. The Grants hotel owned by G Corp. failed some quality inspections by Wyndam because Wyndam is requiring a new check-in system and new mattresses, all at a cost over $40,000.

75. G Corp. is making only partial payments to Wyndam – it is paying the franchise fee but not the marketing fee over which it has a legitimate dispute.

76. Because it has not paid the marketing fee, G Corp.'s hotel is restricted from the Wyndam reservations system, but there is no evidence that has significantly affected its business.

77. G Corp. may decide to change its flad if unable to reach a satisfactory compromise with Wyndam.

78. With the exception of ADJ, the corporations show net income through the end of May 2012 such that Mr. Reinhardt cannot say that taking money out from them over the past six years has been detrimental to those corporations. [HT-II 51:18-22].

79. As to allegations of lack of maintenance, only ADJ's Gallup hotel requires significant maintenance in the form of stucco repair, but ADJ lacks the funds for those repairs.

80. ADJ's decision to change the Gallup hotel's flag from Comfort Inn to Baymont was based on Baymont's requirement that a third floor and elevator be added to the structure which was cost prohibitive.

81. There are reasons other than mismanagement – including the declining economy – for the financial troubles of ADJ's Gallup hotel.

82. The only loan that is delinquent is ADJ's SBA loan on which Jetinder is a guarantor, and Defendants are negotiating to reduce those payments. [HT-III 35:3–17]

83. As well as Plaintiff Jetinder, Defendants Harpreet and Aman also will personally lose money if the Gallup hotel goes under.

84. There is a dispute whether Jetinder was involved in the ADJ's 2008 attempt to sell the Gallup hotel.

85. All three Defendants have training and experience managing hotels. [HT-III 56:3–7, 10–14 & 17-19]

86. Reinhardt knew of no inefficiencies in the running of the Gallup hotel that a receiver would be able to fix. [HT-II 144:8–9]

87. Appointing a receiver as to even one of the corporations running the hotels would cost approximately 4% of revenue. [HT-II 54:14–25]

88. It is undisputed that the hotels constitute the primary assets of the parties.

## **CONCLUSIONS OF LAW**

1. The Court has jurisdiction over the parties and the subject matter and venue is proper in this Court.

2. The parties have consented to me deciding the emergency motion to appoint a receiver.

3. Appointing a receiver is an extraordinary equitable remedy which requires movant to make a clear showing of the existence of: irreparable harm, a valid claim, probability of fraudulent conduct, imminent danger of loss and lack of a less drastic remedy. Also movant must demonstrate that appointment will not damage the interests of the shareholders.

4. As directors of the corporations, Defendants owe a heightened fiduciary duty to the minority shareholder Plaintiffs, but such duty does not diminish the requirement of showing irreparable harm to warrant the appointment of a receiver.

5. Plaintiffs have not made a clear showing that they will suffer irreparable injury in the absence of appointment of a receiver – monetary damages can adequately address any injury.

6. Plaintiffs fail to make a clear showing that the hotels are in imminent danger of diminished value or loss under current management or that a receiver would provide better management at this time.

7. The corporations must be considered separately. Contrary to Plaintiffs' position, none of the corporations or its respective shareholders is obligated to bail out any struggling corporation even if that corporation has common directors or shareholders.

8. There is a legitimate dispute regarding the capital contributions made by the parties, and on the record before me, I am unable to ascertain the capital contributions made by the parties and how the allocations of interest were determined in the four corporations. Therefore, Plaintiff have failed to clearly show valid claims sufficient to justify a receivership.

9. Defendants' contention that they cannot pay distributions to Plaintiffs because their proportionate interests are in dispute is questionable given that they have made distributions to themselves.

10. However, to the extent that Plaintiffs assert that continued distributions to Defendants are fraudulent, inherently unfair and in breach of a fiduciary duty to Plaintiffs, they can seek a less drastic remedy such as a moratorium on future distributions to all shareholders.

11. Given that a bench trial on the merits is scheduled for February 2013, it is likely that the appointment of a receiver will be more disruptive than helpful.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff's Emergency Motion to Appoint a Receiver *(Docs. 139)* (*also at Doc.246)* is **denied.**

_____
UNITED STATES CHIEF MAGISTRATE JUDGE